Filed 1/31/17

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RINCON EV REALTY LLC et al., Plaintiffs and Appellants, v. CP III RINCON TOWERS, INC., et al., Defendants and Respondents. | A138463 (City & County of San Francisco Super. Ct. No. CGC 10–496887) |

Plaintiffs Rincon EV Realty LLC, Rincon ET Realty LLC and Rincon Residential Towers LLC borrowed $110 million in 2007 from Bear Stearns Commercial Mortgage, Inc. (Bear Stearns) to finance the purchase of Rincon Towers, a San Francisco apartment complex (the Property). In 2010, after plaintiffs failed to repay the loan and after changes in the ownership of the loan, defendant CP III Rincon Towers, Inc. (CP III) purchased the Property at a nonjudicial foreclosure sale. Plaintiffs sued CP III and seven other entities who were involved in administering the loan, unsuccessful workout negotiations, and the eventual foreclosure sale, alleging various causes of action, some legal (breach of contract, fraud, slander of title, trade secret misappropriation), and some equitable (unfair competition, to set aside the foreclosure sale, and for an accounting). After a bench trial, the trial court rejected all of these claims in a detailed and thoughtful statement of decision.

On appeal from the ensuing judgment, plaintiffs contend (1) the trial court erred by striking their demand for a jury trial, (2) a discovery referee appointed by the court made erroneous rulings that were prejudicial and denied plaintiffs a fair trial, (3) the court

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B and II.C.

1

erred in analyzing plaintiffs' unfair competition claim, (4) the foreclosure sale is void because CP III did not own the loan and had no right to foreclose, and (5) prejudicial irregularities in the foreclosure sale require that it be set aside. In the published portion of this opinion, we conclude the court erred by striking plaintiffs' jury demand, which applied only to their legal causes of action; in the unpublished portion of the opinion, we reject plaintiffs' remaining appellate challenges. As a result, we reverse the judgment and remand for further proceedings as to the legal causes of action, while affirming as to the equitable causes of action.

## I. BACKGROUND

In June 2007, plaintiffs purchased the Property for approximately $143 million. Plaintiffs' investor sponsor is Richard Cohen. At the time of trial, Cohen and his business entities had a real estate portfolio worth something in the range of $1.5 billion to $2 billion.

Plaintiffs financed their purchase of the Property in part by borrowing $110 million from Bear Stearns (the Loan, or the Rincon Loan). The Loan was evidenced by a promissory note (the Note) and secured by a deed of trust on the Property. The governing loan agreement (the Loan Agreement) specified the Loan was due two years later, in June 2009, unless plaintiffs exercised an option to extend the maturity date of the Loan for another year, to June 2010. The Loan Agreement provided that, to exercise the option, plaintiffs would have to satisfy certain conditions, including submission of an appraisal showing the principal amount of the Loan did not exceed 72 percent of the fair market value of the Property. The appraisal was to be prepared in a manner consistent with the methodology used for the appraisal delivered in connection with the origination of the loan in 2007.

After the collapse of Bear Stearns in 2008, Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1 (the Maiden Lane Trust, or the Trust) acquired the Loan. The Trust was established by the Federal Reserve Bank of New York (FRBNY) to facilitate the acquisition of Bear Stearns by JP Morgan Chase (JP Morgan). The Trust acquired the Rincon Loan as part of a portfolio of commercial mortgage loans that JP

2

Morgan did not want to acquire. Maiden Lane LLC was the beneficiary of the Maiden Lane Trust, and U.S. Bank National Association (USB) was the trustee. FRBNY was the sole and managing member of Maiden Lane LLC; a Trust and Master Servicing Agreement (Trust Agreement) designates FRBNY as the "Controlling Party" of the Trust. BlackRock Financial Management, Inc. (BlackRock) was the operating advisor to the Trust. The Trust Agreement designates LaSalle Bank National Association (LaSalle) as the custodian and Bank of America, N.A. (Bank of America) as the master servicer.[1]

Plaintiffs did not repay the Loan by the June 2009 maturity date (and, indeed, never repaid any portion of the principal amount of the Loan). In 2009, plaintiffs took the position they were entitled under the Loan Agreement to a one-year extension of the maturity date to June 2010. The Maiden Lane Trust disagreed, telling plaintiffs they had not met the conditions for an extension and were in default. In 2009, the Trust, through BlackRock, engaged in negotiations with plaintiffs about a possible modification of the Loan. In connection with these negotiations, plaintiffs and the Trust entered a Pre-Negotiation Agreement in March 2009. The negotiations were unsuccessful.

Also in 2009, the Maiden Lane Trust began marketing the Loan to third parties through Eastdil Secured (Eastdil). Eastdil's auction process resulted in the selection (in January 2010) of Carmel Partners as the highest bidder.[2] In February 2010, plaintiffs filed the present lawsuit and recorded a notice of pendency of action (lis pendens) against the Property.

On April 16, 2010, CP III closed on the purchase and acquired the Loan from the Maiden Lane Trust. On June 15, 2010 (after the maturity date that would have applied if

---

[1] FRBNY, BlackRock, LaSalle and Bank of America are not parties, although we granted Bank of America leave to file a brief in this court addressing a single, narrow issue.

[2] In its statement of decision, the trial court stated: " 'Carmel Partners' is the trade name under which several of the Defendants do business—CP III Rincon Towers, Inc. ('CP III'); Carmel Partners, Inc.; Carmel Partners, LLC; Carmel Management, LLC; and CP Investment Fund III, L.P. CP III is the entity that purchased the Loan and foreclosed on the collateral."

3

plaintiffs had been entitled to the one-year extension), CP III initiated nonjudicial foreclosure proceedings by recording a notice of default. CP III acquired the Property at a foreclosure sale on October 12, 2010 with a $73 million credit bid. Plaintiffs' efforts to enjoin the foreclosure were unsuccessful.

Plaintiffs' Fifth Amended Complaint, the operative complaint at trial, asserted the following causes of action: (1) breach of the Loan Agreement, (2) breach of a Cash Management Agreement entered into by plaintiffs and Bear Stearns concurrently with the Loan Agreement, (3) breach of the Pre-Negotiation Agreement entered into by plaintiffs and the Maiden Lane Trust in March 2009, (4) fraud, (5) to set aside the foreclosure, (6) unfair competition (Bus. & Prof. Code, § 17200 et seq.), (7) slander of title, (8) violation of California's Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.), and (9) accounting. The complaint named as defendants (1) CP III, (2) other Carmel Partners entities (Carmel Partners, Inc.; Carmel Partners, LLC; Carmel Management, LLC; and Carmel Partners Investment Fund III, L.P.), (3) USB as trustee for the Maiden Lane Trust, (4) the Maiden Lane Trust, and (5) Maiden Lane LLC (collectively, defendants). After a bench trial, the court entered judgment in favor of defendants on all claims.[3]

_____

[3] Throughout most of the proceedings in this case, there were collateral proceedings in New York. CP III sued Cohen in federal court in New York on June 14, 2010, seeking to recover under a guaranty he signed in connection with the Loan Agreement. (*CP III Rincon Towers, Inc. v. Cohen* (S.D.N.Y. 2014) 13 F.Supp.3d 307, 309, 316, judg. vacated and cause remanded for further proceedings (2d Cir. Nov. 29, 2016, No. 14-1463) ___ Fed.Appx. ___ [2016 U.S.App. LEXIS 21269, 2016 WL 6989480, at p. *7].) In April 2014, the federal district court granted summary judgment in favor of Cohen. (*Id.* at pp. 309, 325.) The Second Circuit Court of Appeals later vacated the district court's judgment and remanded for further proceedings. (*CP III Rincon Towers, Inc. v. Cohen* (2d Cir. Nov. 29, 2016, No. 14-1463) ___ Fed.Appx. ___ [2016 U.S.App. LEXIS 21269, 2016 WL 6989480, at p. *7].) In addition to these federal proceedings, there were some subpoena enforcement proceedings in New York state court arising out of discovery in this case.

## II.  DISCUSSION

A.   **Plaintiffs' Jury Demand**

   1.   **Additional Background**

The Loan Agreement and the Cash Management Agreement each include a New York choice-of-law provision, printed in bold face type and capital letters.  The choice-of-law provision states in part:

> **<u>Governing Law</u>.  [¶]  . . . THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA . . . .[4]**

The choice-of-law provisions also specify that plaintiffs waive any claim that California law, or the law of any state other than New York, governs the parties' agreements:

> **TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES**

---

[4] The Loan Agreement states an exception to the applicability of New York law, specifying that "the provisions for the creation, perfection, and enforcement of the lien and security interest created pursuant hereto and pursuant to the other loan documents shall be governed by and construed according to the law of the state in which the property is located . . . ."

**ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

The Loan Agreement and the Cash Management Agreement also specify that the parties waive the right to trial by jury. The jury waiver provision, which also is set forth in bold face type and capital letters, states:

**Trial by Jury. [¶] BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. BORROWER AND LENDER ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

The Pre-Negotiation Agreement also contains a New York choice-of-law provision and a broad contractual jury trial waiver.

According to briefs submitted by the parties to the trial court and the court's subsequent order addressing this issue, plaintiffs' Fourth Amended Complaint (filed in December 2011) included a demand for jury trial of all causes of action triable by jury.[5]

---

[5] The Fourth Amended Complaint is not in the record on appeal. In their motion to strike the jury demand, defendants quoted the Fourth Amended Complaint as including the statement, " 'Plaintiffs hereby demand trial by jury of all causes of action triable of right by a jury.' "

In January 2012, defendants filed a motion to strike plaintiffs' jury demand. Defendants argued the jury waiver provisions in the parties' agreements were enforceable under New York law, which applied pursuant to the choice-of-law provisions in those agreements. Defendants also contended some of plaintiffs' claims (the claims to set aside the foreclosure, for unfair competition and for an accounting) were not triable by jury in any event.

In their opposition to defendants' motion, plaintiffs specified they sought a jury trial on their claims for breach of contract, fraud, slander of title, and violation of the UTSA. Plaintiffs argued they were entitled to a jury trial on those claims because (1) under applicable conflict-of-laws principles, California law applied notwithstanding the New York choice-of-law provisions in the governing contracts, and (2) under California law, the contractual jury waivers were unenforceable. Plaintiffs stated that their remaining causes of action (to set aside the foreclosure, for unfair competition and for an accounting) were "equitable in nature," and that plaintiffs did not seek a jury trial for those claims.

After holding a hearing, the trial court issued a written order granting defendants' motion to strike the jury demand. In its order, the court noted plaintiffs sought a jury trial on "their legal causes of action for breach of contract, fraud, slander of title, and violations of [the UTSA]." (Fn. omitted.) Applying the framework set forth in *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459 (*Nedlloyd*), the court concluded the choice-of-law provisions in the parties' contracts were enforceable, and dictated the application of New York law and thus the enforcement of the contractual jury waivers.

Plaintiffs subsequently filed a Fifth Amended Complaint, which included the same claims that were at issue when defendants moved to strike plaintiffs' jury demand. After a bench trial, the court issued a detailed statement of decision addressing all of plaintiffs' claims, and subsequently entered judgment in favor of defendants on all claims.

## 2. The Court Erred by Striking Plaintiffs' Jury Demand

In determining whether to enforce contractual choice-of-law provisions, we apply the principles set forth in section 187 of the Restatement Second of Conflict of Laws (the

7

Restatement). (*Nedlloyd, supra,* 3 Cal.4th at pp. 464–465.) In *Nedlloyd*, our Supreme Court explained that, under the Restatement approach, a court must first determine "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a 'materially greater interest than the chosen state in the determination of the particular issue . . . .' (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." (*Nedlloyd, supra,* 3 Cal.4th at p. 466, fns. omitted.) Where the relevant facts are undisputed, the determination whether a contractual choice-of-law provision supplants the law that would otherwise apply is a legal question that we review de novo. (*Brack v. Omni Loan Co., Ltd.* (2008) 164 Cal.App.4th 1312, 1320.)

Applying the first step of the *Nedlloyd* test, the trial court correctly found (and plaintiffs do not dispute) that New York has a substantial relationship to the parties and their transaction. The Loan Agreement and the Cash Management Agreement state that each of the plaintiffs is a Delaware limited liability company with its "principal place of business" in New York. (See *ABF Capital Corp. v. Grove Properties Co.* (2005) 126 Cal.App.4th 204, 217 (*Grove Properties*); Rest., § 187, com. f, pp. 566–567 [party's principal place of business in chosen state establishes substantial relationship].) In the Loan Agreement and the Cash Management Agreement, the parties agreed New York "has a substantial relationship to the parties and the underlying transaction embodied" by each agreement. The agreements were negotiated in New York; the Loan made pursuant to the agreements was made and accepted in New York; and the proceeds of the Loan were disbursed in New York.

8

Under New York law, predispute contractual jury trial waivers generally are enforceable. (*Barclays Bank of New York, N.A. v. Heady Electric Co., Inc.* (1991) 174 A.D.2d 963, 964 [571 N.Y.S.2d 650].) Plaintiffs argue, however, that the trial court erred by applying New York law to determine the enforceability of the jury waiver provisions in the parties' contracts. Relying on the *Nedlloyd* framework, plaintiffs contend that application of New York law would be contrary to a fundamental policy of California, and that California has a materially greater interest than New York in determining the enforceability of the jury waiver provisions. (See *Nedlloyd, supra,* 3 Cal.4th at p. 466.) Plaintiffs suggest alternatively that the choice-of-law provisions do not or cannot apply to this question; plaintiffs contend the contractual choice of New York law extends only to "substantive" issues, while the enforceability of the jury waivers is a "procedural" issue that is governed by the law of the forum notwithstanding the choice-of-law clauses.

Assuming without deciding the choice-of-law provisions in the parties' agreements direct the application of New York law to determine the enforceability of the jury waiver provisions in those agreements,[6] we conclude that, under *Nedlloyd*, the choice of New York law is not enforceable, and the validity of the jury waivers is governed by California law. We therefore need not address plaintiffs' alternative contention that the question of the validity of the jury waivers is outside the scope of the choice-of-law provisions (or falls within a category of questions that can never be the subject of an effective contractual choice of law).

Turning to the question whether California has a fundamental policy concerning contractual waivers of the right to jury trial at the second step of the *Nedlloyd* analysis, we note that Article I, section 16 of the California Constitution states the right to trial by jury is "an inviolate right," and in "a civil cause," any waiver of that right must occur by the consent of the parties "expressed as prescribed by statute." Section 631 of the Code

---

[6] The choice-of-law provisions state questions of "validity" of the agreements are to be governed by New York law.

of Civil Procedure,[7] which implements the constitutional provision, states the right to trial by jury is "inviolate," and may be waived in civil cases only as specified in subdivision (f) of its provisions. (§ 631, subd. (a).) Subdivision (f) of section 631 enumerates six methods by which the right to jury trial may be forfeited or waived, including failure to appear at trial, failure to demand jury trial within a required timeframe after the case is set for trial, failure to pay required fees, oral consent in open court, or written consent filed with the clerk or the court. In *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 950, 956–958, 961, 967 (*Grafton*), our Supreme Court held that, because the waiver methods specified in section 631 are exclusive—and because all of them apply only after a lawsuit has been filed—a predispute agreement specifying that any lawsuit between the contracting parties will be adjudicated in a court trial, rather than a jury trial, is unenforceable. We think the same analysis applies here.

"[I]t is for the Legislature, not th[e] court[s], to determine whether, and under what circumstances, a predispute waiver of jury trial will be enforceable in this state." (*Grafton, supra,* 36 Cal.4th at p. 967.) As the *Grafton* court explained, the Legislature has expressly authorized agreements to submit future disputes to arbitration or to a referee. (§§ 638, 1281; *Grafton, supra,* 36 Cal.4th at pp. 960–961.) But neither section 631 nor any other statute authorizes predispute waivers of the right to jury trial by parties who submit their disputes to a judicial forum. (*Grafton, supra,* 36 Cal.4th at pp. 951, 956, 961.) Such waivers therefore are not enforceable. (*Id.* at p. 967.) In so holding, the *Grafton* court interpreted and applied California constitutional and statutory provisions governing waiver of the right to jury trial. Although *Grafton* did not involve a choice-of-law question, the Supreme Court founded its analysis, as we do here, on the premise that the right to jury trial in California is "fundamental," "inviolate," and " 'sacred in its character[.]' " (*Id.* at pp. 951, 956; accord, *Cohill v. Nationwide Auto*

---

[7] All statutory references are to the Code of Civil Procedure unless otherwise stated.

10

*Service* (1993) 16 Cal.App.4th 696, 699 [" 'The right to trial by jury is a basic and fundamental part of our system of jurisprudence.' "].)

After identifying this fundamental right, the Court went further, explaining that, under *Exline v. Smith* (1855) 5 Cal. 112 (*Exline*) and subsequent cases, "the rules under which the parties to a lawsuit may waive a jury trial must be prescribed by the Legislature, which is without power to delegate to the courts the responsibility of determining the circumstances under which such a waiver may be permitted." (*Grafton*, *supra*, 36 Cal.4th at p. 952; accord, *id.* at p. 956 ["Our decision in the *Exline* case was based in part upon our understanding that the [F]ramers of the Constitution intended to restrict to the Legislature the power and obligation to establish rules for jury waivers, because '[t]he right of trial by jury is too sacred in its character to be frittered away or committed to the uncontrolled caprice of every judge or magistrate in the State.' "].)[8] Because California statutes specify how and under what precise circumstances parties may waive or forfeit the right to jury trial—by taking or failing to take certain steps after litigation has begun (§ 631, subd. (f)), or by entering an agreement to submit future

---

[8] As the foundation for this point, the *Grafton* court quoted extensively from Justice Simons and his First District, Division Five colleagues in the Court of Appeal opinion under review in *Grafton*, tracing the pertinent history. *Exline* is the centerpiece of that history. " 'In *Exline* the Supreme Court considered a jury waiver that arose under a court rule adopted pursuant to the statute (§ 179 of the Cal. Civil Practice Act). The Supreme Court concluded that our Constitution forbids the creation of judicial rules of waiver, even if such rules are promulgated pursuant to a legislative delegation of such power to the judiciary. The court interpreted the phrase "prescribed by law" within article I, section 3, of the California Constitution of 1849, to mean that the Legislature, alone, had the power to determine the circumstances under which a jury could be waived. "The Constitution has imposed the power as well as the necessity upon the Legislature, of determining in what cases a jury trial may be waived, which cannot be transferred or delegated to any other department of Government. The words 'prescribed by law,' look to actual legislation upon the subject, and in no just sense can be extended to a permission of the exercise of this power to others. [¶] . . . [T]he power to 'prescribe by law' is legislative and cannot be conferred on judicial officers . . . ." (*Exline, supra,* 5 Cal. at pp. 112–113.)' " (*Grafton*, *supra*, 36 Cal.4th at p. 953.)

11

disputes to arbitration or to a referee (§§ 638, 1281)—the *Grafton* court took the view that courts may not invade the Legislature's exclusive domain by enforcing waivers outside the prescribed statutory scheme. In our view, that is the essential teaching of the case. Pointing to "firmly rooted" constitutional history, *Grafton* concluded that, " 'unless the Legislature prescribes a jury waiver method, we cannot enforce it.' " (*Grafton*, *supra*, 36 Cal.4th at pp. 953, 956.)

Other portions of the *Grafton* court's analysis underscore the importance of the rule that the Legislature retains sole authority to determine permissible methods of jury waiver. The court rejected a claim that it was "anomalous" to prohibit a "knowing, voluntary, written" predispute waiver of the right to jury trial, given that section 631 permits parties to forfeit the right through their own negligence, such as by failing to file a timely demand for jury trial (§ 631, subd. (f)(4)), or by failing to deposit required fees in a timely manner (§ 631, subd. (f)(5), (6)). (*Grafton*, *supra*, 36 Cal.4th at pp. 963–964.) This result is not anomalous, the court pointed out, because the forfeiture provisions at issue "were created by the *Legislature.* They form part of a considered procedural scheme intended to create a balanced adversarial system and a fair system of public administration of justice—a system that can be altered by legislation after due deliberation." (*Id.* at p. 964.) In addition, while acknowledging that a majority of state and federal jurisdictions permit predispute waiver of the right to jury trial, the *Grafton* court explained that any argument for adoption of this approach in California should be addressed to the Legislature, which can evaluate any associated benefits or potential problems with the approach and develop any appropriate safeguards that should accompany its adoption.[9] (*Id.* at pp. 965–966.) Each of these additional considerations, above and beyond the pertinent constitutional history, is equally relevant here and serves

---

[9] Defendants note that Justice Chin, in his concurring opinion in *Grafton*, urged the Legislature to authorize predispute jury waivers. (*Grafton*, *supra*, 36 Cal.4th at pp. 968–970 (conc. opn. of Chin, J.).) But Justice Chin, who also joined the majority opinion in *Grafton*, agreed that the Legislature, not the courts, must evaluate the appropriateness of such a course. (*Id.* at pp. 968, 970.)

12

to reinforce our conclusion that application of New York law to permit enforcement of the predispute contractual jury waivers at issue in this case (i.e., permitting waiver by a method not expressly authorized by the Legislature) would be contrary to fundamental California policy.

We come, then, to the last leg of the choice-of-law analysis—whether California has a materially greater interest than New York in " 'the determination of the particular issue,' " i.e., the enforceability of the jury waiver provisions in the parties' agreements. (*Nedlloyd*, *supra*, 3 Cal.4th at p. 466.) The trial court concluded that, even assuming enforcement of a predispute contractual jury waiver would be contrary to a fundamental California policy, California does not have a materially greater interest than New York in determining the enforceability of the jury waivers at issue here. The court noted that, although the property that is the subject matter of this litigation is in California, "all parties to the agreements at issue were sophisticated commercial or business entities." The court further noted New York's extensive contacts with the parties and the underlying loan transaction—"[a]ll parties to the original loan were domiciled in New York," "[t]he contracts at issue were negotiated and signed in New York, and the loan was disbursed in New York." Finally, the court noted that, although the Carmel Partners entity defendants (who were not signatories to the original agreements) are based in California, they sought to enforce the New York choice-of-law provisions and the jury waivers. The court thus concluded: "New York's interest in protecting the bargained for expectations of sophisticated commercial entities to contracts negotiated, signed, and performed in New York outweighs California's limited interest in a jury trial simply because the property is located here."

We see this issue differently. In our view, the relevant "interest" of California for purposes of the *Nedlloyd* analysis is not solely an interest in whether this dispute is resolved by a jury trial. Instead, California has an interest in enforcing its policy that only the Legislature can determine the permissible methods for waiving the right to jury trial when parties submit their civil disputes to a court in this state for resolution. A major theme running throughout the defendants' argument on this issue, adopted by the

13

trial court in its rationale, is that all of the parties involved are highly sophisticated commercial entities. The point is undeniable on this record, but on a faithful application of the principles announced in *Grafton* distinctions providing different levels of protection to different types of litigants must be drawn by the Legislature, not by courts examining the characteristics of the parties on a case-by-case basis. (*Grafton*, *supra*, 36 Cal.4th at pp. 965–966.) In fact, *Grafton* addressed this very argument when it observed that, if the Legislature were inclined to create a sophisticated parties exemption, it might wish to develop any number of limitations, while "keeping in mind potentially divergent concerns faced by business entities negotiating commercial contracts, on the one hand, and consumers presented with form contracts, on the other." (*Id.* at p. 966.) We take this point as a recognition, with which we agree, that, institutionally, courts are not well-equipped to craft such limitations in case-by-case adjudication.

Because the policy at stake in this case "form[s] part of a considered procedural scheme intended to create a balanced adversarial system and a fair system of public administration of justice," we conclude that California, as the forum for adjudication of this dispute, has the paramount interest here. (*Grafton*, *supra*, 36 Cal.4th at p. 964; *Grove Properties, supra,* 126 Cal.App.4th at pp. 217, 223 [California, as forum state, had substantially greater interest than chosen state (New York) in determination of a "procedural issue," i.e., the reciprocity of contractual attorney fees under Civ. Code, § 1717].)[10] We recognize, as did the trial court, that New York has an interest in protecting the expectations of parties who enter contracts in New York. (See *Guardian Savings & Loan Assn. v. MD Associates* (1998) 64 Cal.App.4th 309, 323 (*Guardian*).)

---

[10] Holding to the contrary is *ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 839 (*Berglass*), where the court concluded California did not have a materially greater interest than New York in determining the availability of reciprocal attorney fees (which are available under California law pursuant to Civ. Code, § 1717). But the *Berglass* court never addressed whether Civil Code section 1717 reflected a fundamental California policy for purposes of the *Nedlloyd* analysis, because it determined New York law would have applied even if the parties had not included a choice-of-law provision in their contract. (*Berglass, supra,* 130 Cal.App.4th at p. 837.) Here, in contrast, we have concluded California's policy on jury waivers is fundamental.

14

But when those parties come to a California courtroom, this state has a considerable interest in how the proceeding is conducted. Like every other California litigant, each party to this case is entitled to rely upon California's commitment to protection of fundamental rights within the civil justice system as a whole. Taking a step back from this particular case, as we must in evaluating the relevant policy interests, the constitutionally protected and legislatively declared policy we perceive here may be viewed as but one expression of the priority we place upon access to civil justice on the same terms for everyone, with no exceptions for the sophisticated or the wealthy. At stake here is a fundamental right for all litigants (i.e., those who are parties to civil lawsuits in California courts, see § 631, subd. (a) [constitutional right to jury trial "shall be preserved to *the parties* inviolate"], italics added), not just a right for consumers or those needing protection from contractual overreaching (see Cal. Const., art. I, § 16; *Grove Properties, supra,* 126 Cal.App.4th at p. 218 [reciprocal attorney fee statute was designed for the benefit of all litigants, not just unsophisticated ones]).

Nor does the out-of-state residency of some of the parties change the calculus when we shift our focus specifically to this case. Defendants insist that, because plaintiffs are New York residents, California has "no interest in protecting *them* from the consequences" of the contractual jury waivers at issue. Defendants also emphasize that some of the events giving rise to plaintiffs' claims (such as the negotiation and disbursement of the Loan) occurred in New York. Of course, the parties remain entitled to have their contract dispute adjudicated under New York law, and to that extent defendants overstate the importance of the jury waiver in securing the legitimate contractual expectations they and the plaintiffs have. California's policy as to the permissibility of jury waivers, in any event, is not focused solely on the protection of California *residents* (or persons whose claims rest on events occurring entirely in California). Instead, as we have emphasized, it protects the rights of California *litigants*, and is a core aspect of how California has chosen to adjudicate cases within its civil justice system as a whole.

15

*Guardian, supra,* 64 Cal.App.4th 309, which the trial court cited and which defendants cite on appeal, does not persuade us to the contrary. We note, to begin with, that *Guardian* pre-dates *Grafton.* In that case, a judicial foreclosure action involving commercial property located in California, the trial court entered a judgment imposing personal liability on a Texas joint venture. (*Guardian, supra,* 64 Cal.App.4th at pp. 314–315.) The appellants there contended section 580b applied and prohibited the entry of a deficiency judgment, but the trial court enforced a contractual choice-of-law provision adopting Texas law, which imposed no similar restriction. (*Guardian, supra,* 64 Cal.App.4th at p. 315.)

The Court of Appeal affirmed, holding that, while section 580b reflected a fundamental California policy (*Guardian, supra,* 64 Cal.App.4th at pp. 320–322), California's interest in enforcing that policy was not materially greater than Texas's interest in protecting the expectations of the contracting parties, in light of the nature of the transaction in that case (*id.* at pp. 322–323). The court concluded that, because the transaction at issue did not involve the sale of a home and because the parties to the contract were sophisticated Texas domiciliaries, the policies underlying section 580b— including homeowner protection, equitable risk allocation, and "avoiding the aggravation of an economic downturn in a depression"—had limited, if any, application in the commercial setting involved there. (*Guardian, supra,* 64 Cal.App.4th at pp. 318–320, 322–323.) In contrast, Texas had a strong interest in protecting the contractual expectations of Texas domiciliaries. (*Id.* at p. 323.) In these circumstances, the court held enforcement of the Texas choice-of-law provision was proper, but noted "the issue is close" and limited its holding to the facts of the case before it. (*Ibid.*) The court was careful to limit its holding to "the specific circumstances of the present case." (*Ibid.*)

Essentially, the *Guardian* court came to the conclusion that, while the policy of anti-deficiency protection reflected in section 580b is fundamental, that policy was not directly implicated in a complex commercial real estate transaction that had been negotiated with no expectation California law would apply. While there is without doubt some similarity to the issue presented here because of the emphasis the *Guardian* court

16

placed on the involvement of sophisticated out-of-state parties who could take care of themselves, what is key to understand about the case is that the public policy involved was all but irrelevant to the transaction at issue there.  By contrast, the California policy at stake in this case—protection of the right to jury trial for litigants in California courts unless they waive the right in a manner prescribed by the Legislature—is not only directly implicated, but is central to California's system for resolving civil cases, for all litigants.  (*Grafton*, *supra*, 36 Cal.4th at pp. 952–953 [" 'The California Constitution, as originally adopted in 1849, set out the right to a jury trial in the strongest possible terms: " '[T]he right of trial by jury *shall be secured to all*, and remain inviolate for ever; but a jury trial may be waived by the parties in all civil cases in the manner to be prescribed by law.' " ' " (Italics added.)].)  Indeed, the fact that this policy applies to all California litigants, universally, is itself part of the fundamental policy implicated here.

Also distinguishable is *Discover Bank v. Superior Court* (2005) 134 Cal.App.4th 886, 889, 894–895 (*Discover Bank*), another case that had no occasion to consider the implications of *Grafton*.  In *Discover Bank*, the Court of Appeal, applying a choice-of-law provision in a cardholder agreement, held a class action waiver enforceable under Delaware law.  In *Discover Bank*, the plaintiff (a California resident who sought to represent a nationwide class of consumers) sought to invalidate the class action waiver by urging the application of California law concerning unconscionability, which the court stated "is part of the substantive law of contracts."  (*Id.* at pp. 894–895, 897.)  The plaintiff did not argue that California procedural law concerning class actions or related matters provided a basis for invalidating the waiver.  (*Id.* at p. 897.)  In that context, the court concluded California did not have a materially greater interest than Delaware in the application of its law (i.e., California's unconscionability standards), in part because all of the plaintiff's claims were brought under Delaware law and because he sought to represent a nationwide class of consumers (not just California consumers), leading the court to observe that "California has no greater interest in protecting other states' consumers than other states have in protecting California's."  (*Id.* at pp. 894–895, 897.)

17

The reasoning in *Discover Bank* is inapplicable here. In this case, in contrast to *Discover Bank*, plaintiffs do not seek to invalidate the jury waivers by invoking general principles of substantive contract law. Instead, they contend the jury waivers run afoul of California constitutional and statutory provisions that address a specific procedural question, i.e., which cases will be tried by jury in California courts. Those protected, by definition, are litigants in the California courts. Were the venue changed in this lawsuit to New York—we note that no party ever sought to bring that about—the jury trial right the parties enjoy in our courts would not travel with them. Accordingly, for the reasons we have discussed, California, as the forum state, has a materially greater interest than New York in determining the enforceability of the jury waivers at issue here, and under California law, the waivers are not enforceable. The trial court therefore erred by striking plaintiffs' jury demand.

### 3. The Error Requires a Partial Reversal of the Judgment

Plaintiffs contend the trial court's error in striking the jury demand (1) is reversible error per se and does not require a showing of prejudice, and (2) requires reversal of the judgment as to all of plaintiffs' claims, including their equitable claims (for which plaintiffs did not seek a jury trial). We agree with plaintiffs' first argument but not their second.

"Denial of the right to a jury trial is reversible error per se, and no showing of prejudice is required of a party who lost at trial." (*Valley Crest Landscape Development, Inc. v. Mission Pools of Escondido, Inc.* (2015) 238 Cal.App.4th 468, 493.) Accordingly, when a trial court erroneously deprives a party of a jury trial on a cause of action the party was entitled to submit to a jury, reversal of the judgment on that cause of action is required. (*Ibid.*)

We are not persuaded by defendants' argument that a showing of prejudice should be required. In support of their position, defendants cite cases they contend show a "split of authority" on this issue. But the cases cited by defendants addressed situations in which a trial court declined to relieve a party from a prior waiver of jury trial. (See § 631, subd. (g); *McIntosh v. Bowman* (1984) 151 Cal.App.3d 357, 363; *Byram v.*

18

*Superior Court* (1977) 74 Cal.App.3d 648, 653; *Glogau v. Hagan* (1951) 107 Cal.App.2d 313, 318–319.) "Whatever the merits of these cases on their facts, they have no application here, where the trial court did not abuse its discretion in refusing to permit the . . . withdraw[al] [of a] prior [jury] waiver . . . , but denied the [plaintiffs their] constitutional right to such a trial in the first instance." (*Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 698 (*Martin*).) It is true that in the prior waiver context when a party appeals after losing a court trial, rather than seeking immediate writ review of the order denying relief from waiver, some courts have held to the contrary on the question of prejudice.[11] (*McIntosh v. Bowman, supra,* 151 Cal.App.3d at p. 363; *Glogau v. Hagan, supra,* 107 Cal.App.2d at pp. 318-319; but see *Boal v. Price Waterhouse & Co.* (1985) 165 Cal.App.3d 806, 809.) But where, as here, no valid waiver has occurred and a trial court has "denied [a party] its constitutional right to [jury] trial in the first instance," the error is structural, reversible per se. (*Martin, supra*, 51 Cal.App.4th at p. 698; accord, *Selby Constructors v. McCarthy* (1979) 91 Cal.App.3d 517, 527; Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2015) ¶ 2:248, p. 2-46; *id*., ¶ 2:342, p. 2-67.)

We disagree, however, with plaintiffs' assertion that the trial court's error in striking the jury demand requires reversal of the judgment as to all claims, including the equitable claims. While a litigant in a civil action generally has a constitutional right to jury trial on "legal" causes of action, there is no such right with respect to "equitable" causes of action (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 155–156), or "equitable" remedies (*Darbun Enterprises, Inc. v. San Fernando Community Hospital* (2015) 239 Cal.App.4th 399, 408–409). It therefore was not error for the court to decide the equitable claims here. And the erroneous denial of a jury trial on other claims provides no basis for reversing the judgment on the equitable claims. (See *Valley Crest Landscape*

---

[11] We note a case pending before our Supreme Court presents the question whether the Court of Appeal erred by reviewing a party's right to a jury by writ of mandate rather than appeal. (*Shaw v. Superior Court*, review granted November 12, 2014, S221530, arg. scheduled for Feb. 7, 2017.)

19

*Development, Inc. v. Mission Pools of Escondido, Inc., supra,* 238 Cal.App.4th at pp. 477–478, 493 [reversing judgment against defendant solely as to "legal" claim for express indemnity based on denial of defendant's right to jury trial as to that claim, while affirming judgment against defendant on equitable subrogation claim].)

With little elaboration, plaintiffs contend in their opening brief that jury findings in their favor on certain contractual issues would support favorable findings on their equitable claims. Contrary to plaintiffs' suggestion, however, they were not entitled to have a jury determine the legal issues before the trial court determined the equitable ones. To the contrary, as we explained in *Hoopes v. Dolan, supra,* 168 Cal.App.4th at p. 157, "[i]t is well established in California jurisprudence that '[t]he court may decide the equitable issues first, and this decision may result in factual and legal findings that effectively dispose of the legal claims.' [Citation.] This [D]istrict Court of Appeal has observed that the 'better practice' is for 'the trial court [to] determine the equitable issues before submitting the legal ones to the jury.' " We decline to reverse the trial court's judgment on the equitable claims based on speculation that, if the trial court had not stricken plaintiffs' jury demand, (1) it would have departed from the " 'better practice' " of trying the equitable claims and issues first, and would instead have submitted the legal issues to the jury first, and (2) the jury would have made findings favorable to plaintiffs that would have caused the court to reach a different result on the equitable claims.

In their reply brief, plaintiffs place a new spin on their effort to persuade us to reverse on the equitable claims, suggesting that, if the court had not stricken their jury demand and had instead announced it would bifurcate the equitable and legal issues, they might have chosen to abandon some of the equitable claims to ensure they could present their legal claims to the jury. (See *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 [by waiving their claim for equitable relief, plaintiffs "made an election of remedies in order to secure a trial by jury"].) There is a gap in the logic. We fail to see how the possibility plaintiffs might have *dropped* some of their equitable claims is a basis for reversing the judgment on those claims and allowing plaintiffs another chance to pursue them.

20

We also note this is not a case in which a party was unfairly surprised by the court's resolution of certain claims or issues. (Cf. *Darbun Enterprises, Inc. v. San Fernando Community Hospital, supra,* 239 Cal.App.4th at pp. 411–412 [where plaintiff in breach of contract action sought both damages and the equitable remedy of specific performance, and trial court made misleading and inconsistent statements about whether it would decide the common issue of breach, the plaintiff did not have the opportunity to preserve its right to jury trial by abandoning its request for equitable relief].) In light of plaintiffs' own statement that they did not seek a jury trial on the equitable claims (and in light of the court's subsequent order striking the jury demand), plaintiffs could not have been surprised that the court resolved the equitable claims and issues.[12] The court's error in striking plaintiffs' demand for a jury trial on their legal claims thus does not require reversal of the judgment as to the equitable claims, including the claims to set aside the foreclosure and for unfair competition. (See *Raedeke v. Gibraltar Sav. & Loan Assn., supra,* 10 Cal.3d at p. 671 ["An action to set aside a trust deed foreclosure is an equitable action and one in which the plaintiff ordinarily would have no right to jury trial."]; *Hodge v. Superior Court* (2006) 145 Cal.App.4th 278, 284–285 [cause of action for unfair competition in violation of Bus. & Prof. Code, § 17200 is equitable].)[13]

---

[12] Defendants assert that, on remand, the trial court's previously-entered judgment on the equitable claims would likely require the court to enter summary judgment for them on any remaining legal claims. Plaintiffs disagree, contending even the present judgment on the equitable claims would not eliminate their right to submit some issues to a jury. We need not address this issue, except to point out the fact we reverse in part for lack of an enforceable jury waiver does not mean the plaintiffs are necessarily entitled to a jury trial on their remaining legal claims. On remand, defendants may submit to the trial court any section 437c motion or other form of dispositive motion they may wish to file. We express no view about whether the grounds relied upon by the trial court for rejecting any of plaintiffs' claims—equitable or legal—might justify granting such a motion.

[13] In their reply brief, plaintiffs (citing *Selby Constructors v. McCarthy, supra,* 91 Cal.App.3d 517) suggest they may be entitled to a jury trial on some aspects of their Fifth Cause of Action to set aside the foreclosure. Plaintiffs have waived or forfeited any such argument. As noted, plaintiffs expressly stated in the trial court that they did not seek a jury trial on this cause of action, and that it was an equitable claim.

21

We will, however, reverse the judgment only as to the claims for which plaintiffs sought a jury trial, i.e., their claims for breach of contract, fraud, slander of title and violation of the UTSA. In moving to strike plaintiffs' jury demand as to those causes of action, defendants relied solely on the predispute jury waivers that we have held are unenforceable. And the trial court relied exclusively on the predispute jury waivers in granting the motion.

We do not hold plaintiffs are entitled to a jury trial on every issue raised in their six "legal" causes of action, some of which appear to present both legal and equitable issues. For example, although all six of these causes of action seek damages, three of them (the claims for breach of the Loan Agreement and the Cash Management Agreement and for violation of the UTSA) also seek equitable remedies (specific performance, a constructive trust, and an injunction) as to which there is no right to jury trial.[14] (See *Darbun Enterprises, Inc. v. San Fernando Community Hospital, supra,* 239 Cal.App.4th at p. 409; *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1485.) In the event of a retrial, the trial court may determine which of the remaining claims and issues are equitable, and may determine the order in which the equitable and legal issues will be tried.

## B.      Discovery Rulings

Plaintiffs contend the court abused its discretion by (1) ruling that plaintiffs could not use deposition notices to obtain discovery from FRBNY and four of its employees (none of whom is a party here) on the ground they were "managing agents" of Maiden Lane LLC and the Maiden Lane Trust; (2) permitting USB to respond to discovery requests on behalf of the Maiden Lane Trust; and (3) declining to order Bank of America

---

[14] In the trial court, it appears plaintiffs elected to pursue damages, rather than equitable relief, as to these causes of action. (See *Walton v. Walton* (1995) 31 Cal.App.4th 277, 292–293.) The portions of plaintiffs' post-trial briefs and the trial court's statement of decision addressing these claims focused on whether plaintiffs had established the elements of the causes of action and whether they had proven damages, rather than on whether they were entitled to the equitable remedies mentioned in the Fifth Amended Complaint.

22

to produce emails listed on its privilege log that plaintiffs contend are relevant to a purported assignment of the Note.[15]

"We review a trial court's discovery orders for an abuse of discretion. ' " 'The trial court's determination will be set aside only when it has been demonstrated that there was "no legal justification" for the order granting or denying the discovery in question.' " [Citation.]' [Citation.] Moreover, when a plaintiff does not seek writ review of the trial court's discovery rulings and instead appeals from the judgment, he or she must 'show not only that the trial court erred, but also that the error was prejudicial'; i.e., the plaintiff must show that it is reasonably probable the ultimate outcome would have been more favorable to the plaintiff had the trial court not erred in the discovery rulings." (*MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1045.)

We conclude the trial court did not abuse its discretion in denying plaintiffs' motions to compel discovery from FRBNY and USB. We need not decide if the court's ruling as to the emails on Bank of America's privilege log was an abuse of discretion because, even assuming it was, plaintiffs have failed to demonstrate it is reasonably probable the outcome of the trial would have been more favorable to them had the court ordered production of the handful of emails at issue.

### 1. Deposition Notices to FRBNY and Its Employees

#### a. Additional Background

Plaintiffs initially sought to obtain discovery from FRBNY and its employees by serving them with nonparty subpoenas. In August 2011, plaintiffs served a deposition subpoena on FRBNY, seeking to require it to produce documents and to produce a testifying representative for deposition in New York. Plaintiffs also served deposition

---

[15] The court's order appointing the discovery referee stated he would have authority over all discovery matters. The order stated: "The Referee shall exercise such authority under the supervision of the Court but the Referee's rulings shall stand as the decision of the Court. Said orders may be excepted to and reviewed in like manner as if made by the Court." In practice, the referee typically submitted reports to the court containing his recommended rulings, and the court then issued orders approving those rulings.

subpoenas on three FRBNY employees (Susan Goldberger, Helen Mucciolo and Bruce Davidson), seeking to require them to appear for depositions in New York and produce documents.

In September 2011, after FRBNY and its employees served objections to the subpoenas, plaintiffs asked the discovery referee in this action to order FRBNY and its employees (all of whom plaintiffs referred to as "non-parties") to appear for depositions and produce documents in response to the subpoenas. According to a declaration subsequently filed in a New York court by an attorney for plaintiffs in connection with an action in the New York Supreme Court to enforce the subpoena, "[o]n October 14, 2011, given the jurisdictional objections interposed by FRBNY and its employees, the [discovery referee in the present California action] declined to consider and decide [plaintiffs'] motions . . . requesting an order requiring FRBNY, Susan Goldberger, Helen Mucciolo and Bruce Davidson to comply with [plaintiffs'] subpoenas[.]" In February 2012, the New York court quashed the subpoenas, finding in part that they were "overly broad on their face."[16]

In March 2012, FRBNY voluntarily produced Goldberger for a deposition in New York. In addition, FRBNY voluntarily produced documents to plaintiffs.

In April 2012, plaintiffs served party deposition notices on FRBNY and four of its employees (Mucciolo, Davidson, Shira Silver and Stephanie Heller), seeking to require them to appear for depositions in New York and to produce documents. Plaintiffs then filed a motion asking the discovery referee to determine that FRBNY and its employees are " 'officer[s], director[s], managing agent[s], or employee[s]' " of defendants Maiden Lane LLC and/or the Maiden Lane Trust, and that therefore FRBNY and its employees were required to "appear for depositions in New York and produce non-redacted documents in response to party deposition notices issued by Plaintiffs."

---

[16] Plaintiffs appealed this order. According to the parties' appellate briefs in the present action, plaintiffs later voluntarily dismissed their appeal of the order. Plaintiffs state they did so "only after [the trial in the present action] ended . . . , rendering the appeal of the New York ruling moot."

24

After receiving briefs from both parties and holding a telephonic hearing, the referee issued a report on May 18, 2012, recommending denial of plaintiffs' motion. The referee's recommended ruling stated in part: "1. Neither the employees of [FRBNY] nor [FRBNY] are properly considered 'officer[s], director[s], managing agents[s] [*sic*], or employee[s] of defendants Maiden Lane LLC and/or Maiden Lane Trust' within the meaning of [section 2025.280]. [¶] 2. The Court lacks jurisdiction to compel either the employees [of] [FRBNY] or the [FRBNY] to attend depositions or comply with requests for production of documents as if they were parties to this action." The court issued an order adopting this ruling on May 23, 2012.

### b. Analysis

"Generally, a party may require the deposition of a nonparty only if the party serves the deponent with a deposition subpoena. (§ 2025.280, subd. (b).) Thus, a deposition notice served on the opposing party is inadequate to compel a third party's attendance. (*Ibid*.) However, a subpoena is not required if the deponent is 'an officer, director, managing agent, or employee of a party.' (§ 2025.280, subd. (a).)" (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 600 (*Lopez*).)

On appeal, plaintiffs contend the court abused its discretion by determining FRBNY and its employees were not "managing agents" of Maiden Lane LLC and/or the Maiden Lane Trust within the meaning of section 2025.280, subdivision (a). Our Supreme Court has stated that a "managing agent" for purposes of the discovery statutes is "a person who may exercise his judgment and discretion in dealing with corporate matters, who can be expected to comply with his employer's directive to appear for pretrial examination, and who can be anticipated to identify himself with the interest of the corporation." (*Waters v. Superior Court* (1962) 58 Cal.2d 885, 896 (*Waters*).) " 'The question whether a particular deponent is a "managing agent" of one of the parties for purposes of pretrial discovery proceedings must of necessity be answered pragmatically' and is highly dependent on the particular factual circumstances before the court." (*Lopez, supra,* 246 Cal.App.4th at p. 601.) The party seeking to compel the deposition generally

has "the initial burden to show the foundational facts to support a 'managing agent' finding." (*Ibid.*)

We find no abuse of discretion here. (See *Waters, supra,* 58 Cal.2d at pp. 896–897.) Plaintiffs submitted evidence pertaining to the first and third *Waters* factors, i.e., whether FRBNY exercises judgment and discretion as to the affairs of the Maiden Lane defendants and identifies itself with their interests. (See *Lopez, supra,* 246 Cal.App.4th at p. 602.) Plaintiffs submitted Maiden Lane LLC's financial statements, which state FRBNY is the sole and managing member of Maiden Lane LLC and the controlling party of its assets. Plaintiffs also submitted excerpts of the Trust Agreement stating that FRBNY is the "Controlling Party" of the Trust.

But even if this evidence was sufficient to establish the requisite degree of influence over the Maiden Lane defendants by FRBNY, the court was not required to conclude plaintiffs' evidence satisfied the second *Waters* factor, i.e., that FRBNY and its employees can be expected to comply with the Maiden Lane defendants' directive to appear. (See *Lopez, supra,* 246 Cal.App.4th at p. 602.) Although there was evidence indicating that FRBNY could assert authority over the Maiden Lane defendants and influence their conduct, "there was no evidence showing the reverse was true" (such as evidence showing FRBNY or its employees had previously complied with deposition directives from the Maiden Lane defendants). (*Ibid.*) "Because a party may be subject to severe sanctions if a party-affiliate does not attend a deposition, there must be at least some minimal showing that the party has the ability to induce the deponent to attend the scheduled deposition." (*Id.* at p. 603.) In the absence of such evidence, the court reasonably could conclude plaintiffs did not meet their burden to show FRBNY and its employees were managing agents of Maiden Lane LLC or the Maiden Lane Trust. Plaintiffs' conclusory suggestion in their appellate briefs that FRBNY and its employees "would have appeared for deposition" if the referee had ordered it does not persuade us the court abused its discretion.

We also reject plaintiffs' argument that the referee "employed the wrong legal standard" by adopting an allegedly erroneous interpretation of "managing agent" urged

26

by the Maiden Lane defendants, and therefore "abused his discretion as a matter of law." As noted, the referee's recommended ruling stated his conclusion that FRBNY and its employees were not "managing agents" of the Maiden Lane defendants within the meaning of section 2025.280; the referee did not state he adopted any particular argument advanced by the parties in reaching his conclusion. We will not assume the referee applied an incorrect legal standard. And as noted, under the applicable legal standard, the referee's ruling was not an abuse of discretion. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 [under abuse of discretion test, "we must uphold the trial court 'ruling if it is correct on any basis, regardless of whether such basis was actually invoked' "].)

Finally, plaintiffs contend that, in deciding a subsequent evidentiary issue (in July 2012, during trial), the trial court ruled FRBNY employee Silver is an agent of the Maiden Lane defendants. Plaintiffs assert this ruling establishes the earlier ruling on the "managing agent" issue during discovery was incorrect. We disagree.

On July 16, 2012, during trial, plaintiffs filed a motion to admit into evidence a document (Exhibit 1676) consisting of (1) an email sent in 2010 by FRBNY's Silver to multiple recipients, and (2) a document attached to that email. (The attached document is an "allonge" that plaintiffs claimed showed an assignment of the Note from Bear Stearns to a securitization trust, "Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through Certificates, 2007-PWR17" (the PWR17 trust, or PWR17).) In their written motion, plaintiffs presented several bases for concluding Exhibit 1676 was not inadmissible hearsay, including contending it was an "authorized party admission," a "declaration against interest," an "adoptive admission," and a "statement of a declarant whose right or title is in issue" (citing Evid. Code, §§ 1221, 1222, 1225, 1230), as well as arguing the written statements in the exhibit could be admitted if they had "legal significance independent of their truth or falsity."

On July 25, 2012, during a witness's testimony, plaintiffs' counsel sought to introduce Exhibit 1676, and defendants' counsel objected on hearsay and other grounds. Plaintiffs' counsel responded by arguing each person named on the email was "a defendant or an agent for defendant," and the email was "an admission by a party

27

opponent." Defense counsel responded, "the author of this email [i.e., Silver] is not an agent of anybody, and [the referee] so found in discovery." The court replied that ruling occurred "in a different context," but deferred further argument on the point and noted it had the parties' briefs addressing the issue.

Two days later, on July 27, 2012, the court heard argument about the admissibility of Exhibit 1676. The court stated it had reviewed the parties' written submissions and its tentative view was to admit the exhibit. Defendants' counsel then argued the document had not been properly authenticated and constituted inadmissible hearsay, and plaintiffs' counsel responded to both points. As to hearsay, plaintiffs' counsel stated witness Reginald Leese (a managing director at BlackRock) had "explained" that (1) Silver was an in-house attorney at "the Fed" (i.e., FRBNY), and (2) "the Fed and Maiden Lane are, in fact, interchangeable[.]" Plaintiffs' counsel argued that since "Maiden Lane" was a defendant, Silver's statements were admissible as party admissions. After defendants' counsel reiterated his position that the attachment to the email had not been authenticated, the court stated "I think it has. I think the argument that the defendants make as to the non-admissibility really go to the weight, if any, that can be given to this document of mysterious origin. [¶] . . . [¶] So it's admitted, [Exhibit] 1676, in its entirety." In its oral ruling and in a written order admitting the exhibit, the court did not discuss the hearsay issue or state which hearsay exception it relied on in admitting the document.

The court's ruling admitting Silver's email does not establish that the referee abused his discretion by ruling (two months earlier) that FRBNY and its employees were not "managing agents" for purposes of the discovery statutes. As noted, the record does not show which hearsay exception(s) the court found applicable in deciding to admit Silver's email, and plaintiffs are incorrect in suggesting the court made any explicit "ruling that Silver's writings were party admissions[.]" More broadly, the court's ruling during trial (based on the evidence and arguments presented to it) that a specific email written by Silver was admissible does not show the referee erred two months earlier when he rejected (based on the record before him) the broad claim that FRBNY and four of its

28

employees were "managing agents" of the Maiden Lane defendants and thus were subject to deposition and document discovery as if they were parties.

### 2. Discovery Requests to the Maiden Lane Trust

#### a. Additional Background

Plaintiffs propounded interrogatories and document requests to the Maiden Lane Trust and its trustee, USB.[17] USB, as trustee, served responses to the discovery requests in December 2011. In January 2012, plaintiffs moved to compel the Maiden Lane Trust to respond to the requests, and to compel USB to provide further responses.

In March 2012, after briefing and a telephonic hearing, the referee issued a report (Amended Report No. 9) addressing the motion to compel. The referee's recommended ruling (which the court later adopted) stated (1) the Maiden Lane Trust (which remained a party after having unsuccessfully demurred) was obligated to respond to discovery propounded to it, but (2) the Maiden Lane Trust *had* responded, because USB's responses as trustee constituted responses on behalf of the Maiden Lane Trust. The referee also ordered USB to provide further responses to the document requests and some of the interrogatories, including some that USB had answered by stating it lacked sufficient knowledge of the matters at issue to provide a response. The referee specified (in section A, paragraph 4 of Amended Report No. 9) that, as to all of the further responses he ordered, "[USB] is not obliged, in order to respond, to make inquiry of entities it does not control."

USB, as trustee, served supplemental responses to the discovery requests on March 30, 2012. USB responded to some of the interrogatories by stating that it had no personal knowledge of the matters at issue, but that it had "made a reasonable and good faith effort to obtain the requested information by inquiry to employees of [USB] who are responsible for administering the Trust and review of documents in its possession,

---

[17] Plaintiffs sued both (1) the Maiden Lane Trust, and (2) USB, solely in its capacity as trustee for the Maiden Lane Trust. In a subsequent report addressing the discovery requests at issue, the referee stated plaintiffs "served [this] discovery on [USB] and directed it to [the Maiden Lane Trust]."

custody or control, as applicable." In a letter sent to plaintiffs' counsel as part of a subsequent meet-and-confer process, USB clarified that the only employee at USB with personal knowledge about the loan at issue was Vice President Shannon Rantz. USB stated Rantz was "the account manager responsible for administering [USB's] role for the Maiden Lane Trust, and she provided information in order to respond to Plaintiffs' interrogatories and document requests." USB also stated that "[d]ocuments and information of other entities, such as [FRBNY], are not within [USB's] possession, custody or control or [USB's] personal knowledge, and therefore, were not included in [USB's] responses."

On May 21, 2012, plaintiffs filed a motion to compel further responses to the interrogatories, requesting that the referee order USB or the Maiden Lane Trust to "provide amended responses that include the knowledge and information available to Maiden Lane Trust." After receiving briefing and hearing the matter telephonically, the referee issued another report (Report No. 16) addressing the issue. In his recommended ruling (which the court later adopted), the referee concluded USB's supplemental responses "comply with the obligations imposed on it by" the referee's prior report on the issue.[18]

### b. Analysis

Plaintiffs contend that USB's supplemental responses to the discovery requests at issue were inadequate because USB did not "obtain any information from [the Maiden Lane Trust]," and that the referee abused his discretion by declining to order USB to do so. We find no abuse of discretion.

USB explained that, in preparing its responses, it obtained information from the USB employee (Rantz) who had knowledge of the loan at issue and was responsible for

---

[18] In their May 21 motion, plaintiffs also raised concerns about aspects of USB's document production (relating to a privilege log USB produced, and to search terms USB used to collect electronically stored documents). The referee rejected most of these complaints, and plaintiffs do not challenge those rulings on appeal.

administering USB's role in connection with the Maiden Lane Trust.[19]  USB also stated it reviewed documents in its possession, custody or control.  And USB could not have obtained additional information by inquiring of employees of Maiden Lane Trust; both parties informed the trial court that the Trust had no employees of its own.

In their reply brief on appeal, plaintiffs suggest the referee should have required USB to obtain information from other entities, such as FRBNY, in preparing its responses.  We reject this argument.  As noted, the referee's Amended Report No. 9 specifies that, in providing its supplemental responses, "[USB] is not obliged, in order to respond, to make inquiry of entities it does not control."  Plaintiffs do not contend on appeal that (1) the referee abused his discretion by specifying this limitation on USB's discovery obligations, or that (2) the referee should have concluded FRBNY or other entities *were* under USB's control.[20]  Indeed, in the trial court, plaintiffs took the position that they only sought to compel USB to provide information from sources " 'under its control,' " and expressly urged the referee *not* to decide whether any specific entity was under USB's control.

In the original version of Report No. 9 (the first report addressing the motion to compel at issue here), the referee stated (in section A, paragraph 4) that in providing its supplemental responses, " '[USB] is not obliged, in order to respond, to make inquiry of entities it does not control *such as [FRBNY] or BlackRock*.' "  (Italics added.)  Plaintiffs

---

[19] Rantz summarized USB's role in a declaration submitted in opposition to plaintiffs' original motion to compel, stating that "[i]n general, [USB's] duties as trustee are limited to holding legal title to the loans and the deeds of trust or mortgages securing said loans and to otherwise comply with the terms of the [Trust Agreement] including but not limited to receipt and review of various types of notices and documents related to the administration of the Maiden Lane Trust."

[20] In their reply brief, plaintiffs note that nonparty Bank of America states in its appellate brief that it " 'was the 'functional equivalent' of an employee of the Maiden Lane Trust' " for purposes of the attorney-client privilege.  Plaintiffs vigorously disputed that claim in the trial court.  In any event, as we discuss further in the text, plaintiffs did not ask the referee to determine Bank of America or any other entity was under USB's control for purposes of its obligation to provide supplemental discovery responses; instead, plaintiffs urged the referee *not* to make any such determinations.

31

then submitted letter briefing asking the referee to amend the report to eliminate the reference to FRBNY and BlackRock, arguing that their motion to compel had not addressed the question of whether USB controlled those nonparties. Plaintiffs did not object to the referee's general ruling that USB did not have to make inquiry of entities it did not control. To the contrary, plaintiffs argued that "the only issue" raised in their motion to compel was "whether [USB] 'was obligated to obtain information from sources *under its control.*' " (Italics added.)

The referee granted plaintiffs' request and issued Amended Report No. 9. As noted, in that report, section A, paragraph 4 states USB is "not obliged, in order to respond, to make inquiry of entities it does not control"; the amended report does not include the reference to FRBNY and BlackRock.[21]

Because plaintiffs have not shown that USB controlled FRBNY or other entities (and successfully urged the referee not to resolve that question), we decline to hold USB was required to inquire of such entities in preparing its supplemental discovery responses. The referee did not abuse his discretion in concluding (in Report No. 16) that USB's supplemental responses complied with the set of obligations imposed by the referee's prior report (including the unchallenged proviso that USB was not obligated to inquire of entities it did not control).

### 3.    Discovery of Emails Listed on Bank of America's Privilege Log
#### a.    The Allonge to the Note

In connection with the execution of the Note in 2007, Bear Stearns executed and provided to La Salle (the document custodian) a blank "allonge" that would permit a future assignment of the Note.

During discovery in the present action, BlackRock produced an email that FRBNY's Silver (an attorney) sent to Bank of America's Vaughn, BlackRock's Leese,

---

[21] In a footnote, the referee stated he had decided that inclusion of that phrase was "improvident" on the record before him, but he emphasized that his deletion of the phrase was "not intended to imply that the Referee finds that [USB] controls [FRBNY] or BlackRock for purposes of complying with the instant report."

and others on Friday, January 8, 2010. The email attached an undated allonge showing the assignee as "[La Salle], as Trustee for the registered holders of Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through Certificates, 2007-PWR17" (i.e., the PWR17 securitization trust). In her email, Silver states "the custodian [i.e., La Salle] holds an allonge to the Rincon promissory note that does not run to the Maiden Lane trust. I was under the impression that [JP Morgan] had allonges signed in favor of the trust for all of the promissory notes held by Bear Stearns that were to be delivered to the Maiden Lane trust. Can you shed any light on why this does not appear to be the case in this instance? I have attached the allonge for your convenience." BlackRock also produced an email that Vaughn sent to Silver and others on Monday, January 11, 2010, attaching an allonge showing the assignee as "U.S. Bank National Association, as Trustee for the registered holders of the Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1" (i.e., the Maiden Lane Trust). In a declaration that was later submitted to the discovery referee, Vaughn stated that, "upon learning that the allonge had been incorrectly indorsed," he "contacted La Salle to have them correct the indorsement" to identify the transferee as the Maiden Lane Trust.

**b.** **Plaintiffs' Motion to Compel Production by Bank of America**

In response to a subpoena issued by plaintiffs, Bank of America produced documents and provided a privilege log. Plaintiffs filed a motion to compel production of many of the documents listed on the log, including those that plaintiffs believed pertained to the allonge. In their motion and subsequent letter briefs, plaintiffs argued (1) Bank of America did not share a common interest with other entities listed on the log (such as FRBNY, BlackRock and Eastdil), so its communications with those entities were not privileged, (2) the fact that some of the documents listed on the log had already been produced by other entities established they were not privileged, and (3) the communications pertaining to the allonge and its allegedly improper alteration were subject to disclosure under the crime-fraud exception to the attorney-client privilege.

The discovery referee addressed plaintiffs' motion in a series of reports. In Report No. 15 (issued on June 6, 2012), the referee rejected plaintiffs' first two arguments for

production of documents listed on the log. First, the referee concluded that, for the purpose of claiming the attorney-client privilege, Bank of America shared a common legal interest with FRBNY, BlackRock, Eastdil and other entities, so privileged documents shared with Bank of America by these entities retained their privileged character. Second, the referee determined that the fact other entities may have produced certain of the logged documents did not "deprive [Bank of America] of its entitlement as a holder to retain the documents as privileged." The referee determined, however, that further proceedings were appropriate as to the crime-fraud issue. The referee stated that while he was making no finding of misconduct sufficient to waive the privilege, he found "sufficient cause" to require an in camera review of certain documents pertaining to the allonge, and he directed Bank of America to produce those documents for his in camera review. The referee stated that, with that exception, "[Bank of America] is not required to produce documents listed on its privilege log." The trial court later approved Report No. 15.

After defendants moved for reconsideration, the referee issued a report (Report No. 17) on July 6, 2012, stating he had concluded he should not conduct an in camera review of the documents to determine whether they should be produced (see *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 740 (*Costco*)). The referee also concluded that "at this time" he would not determine whether plaintiffs had made a sufficient showing as to the applicability of the crime-fraud exception, or order Bank of America to produce documents, but would consider those questions if requested to do so by the court. The trial court later approved Report No. 17.

On July 18, 2012, after trial had begun, the trial court (in response to a request by plaintiffs) issued an order requesting that the referee rule on whether Bank of America should be required to "produce documents relating to the PWR17 Allonge." The court signed a proposed order prepared by plaintiffs' counsel, and added a handwritten sentence stating: "However, the Referee is requested to 'not order disclosure of [the] communication[s] claimed to be privileged to allow a ruling on the claim of privilege.' [(*Costco, supra,* 47 Cal.4th at p. 740.)]." In response, on July 19, 2012, the referee issued

34

a report (Report No. 18) directing Bank of America to produce documents relating to the PWR17 allonge or its alleged alteration, including any *attachments* to communications listed on Bank of America's privilege log (including the documents the referee referred to as "the PWR17 Allonge" and "the Maiden Lane Allonge"), but *not the email communications themselves*. The trial court later approved that report as well.

Finally, on July 27, 2012, the referee issued a "Report of Case Management Conference and Scheduling Order #12," in which he referred to (1) discussions about the Bank of America privilege issue that occurred at a July 24, 2012 case management conference, and (2) a July 26, 2012 letter from plaintiffs' counsel requesting that the record reflect some of the discussions at the July 24 conference. In his July 27 report, the referee stated that, when he issued Report No. 18 (on July 19; ordering Bank of America to produce the allonges but not the related emails), he understood the court's handwritten sentence in its July 18 order as a request that he not order *production to plaintiffs* of any email communications. At the July 24 case management conference, plaintiffs' counsel told the referee that the court had explained that the handwritten sentence meant the referee should not *review any documents in camera* to determine which documents should be produced to plaintiffs; plaintiffs' counsel argued the sentence was not a direction to the referee to exclude communications from any production he might order.

In his July 27 case management report, the referee stated that, if he had correctly read the court's July 18 order, he "probably would have ordered" (in his Report No. 18, issued on July 19) the production of some emails pertaining to the allonges. The referee stated, however, that, "on further reflection and based on the discussion of the parties occurring on July 24, 2012," he would not alter his ruling requiring production of the allonges but not the emails.[22]

---

[22] The July 27 case management report, in contrast to the referee's earlier reports addressing plaintiffs' motion to compel, was not submitted as a recommendation to the court, and the court took no further action on the issue.

### c. Analysis

On appeal, plaintiffs argue the referee should have ordered production of the two emails between Silver and Vaughn attaching the allonges (Entries 231 and 309 on the log), as well as four other purportedly related emails among Bank of America employees and among the recipients of Silver's initial email and an attachment to one of those emails (Entries 283-287 on the log). Plaintiffs contend (1) the emails were not privileged, and (2) even if otherwise privileged, the emails were subject to production under the crime-fraud exception.[23] As noted, we need not resolve these issues, because plaintiffs have not shown it is reasonably probable the outcome of the trial would have been more favorable to them if the court had ordered production of the emails.[24]

BlackRock produced the transmittal emails (Entries 231 and 309), which were sent on January 8 and 11, 2010. Plaintiffs make no contention that Bank of America's production of the same emails would have affected the outcome of the trial.

The remaining five log entries at issue (Entries 283-287) include four emails sent on January 11, 2010 (Entries 283-284, 286-287), and one document that apparently was attached to one of those emails (Entry 285). (According to the log, two of the emails (Entries 283 and 287) were communications among Silver, Vaughn and the other persons listed on the two transmittal emails. The other two emails (Entries 284 and 286) were communications among Bank of America employees.) Plaintiffs argue these documents may relate to the allegedly improper alteration of the allonge to show an assignment of the Note to the Maiden Lane Trust, rather than to PWR17. In their appellate briefs, plaintiffs contend briefly that the nonproduction of these documents (in conjunction with the nonproduction of other evidence by FRBNY) was prejudicial because the trial court,

---

[23] Plaintiffs also contend the descriptions of the email *attachments* (the allonges) on Bank of America's log were inaccurate. But the referee ordered Bank of America to *produce* the attachments, and it did so.

[24] Because we find no prejudice, we also need not address defendants' argument that the record contains no reviewable ruling on the applicability of the crime-fraud exception.

36

in its statement of decision after trial, drew inferences against plaintiffs based on the absence of evidence on this point.

We are not persuaded. As we discuss further below, the trial court, in its statement of decision, rejected plaintiffs' argument that Bear Stearns had assigned the Note to PWR17. The court noted plaintiffs' argument was based "on a single email attachment of mysterious origin" produced by nonparty BlackRock (i.e., the "PWR17 allonge" attached to Silver's January 8, 2010 email). The court found that there was no evidence the document was ever attached to the Rincon Note, and noted that "[p]laintiffs have introduced no evidence to explain when or why the attachment was created or even to confirm that the two pages of the attachment go together." The court further found, based on its evaluation of the evidence, that, even if the attachment did exist "in the Loan file," "the PWR17 allonge was a clerical error, which the servicer corrected upon notice."

Plaintiffs' reference to the court's discussion of this point in its statement of decision does not establish the nonproduction of the small number of Bank of America emails at issue was prejudicial. First, plaintiffs' brief argument on this point is that the nonproduction of the Bank of America documents, *in conjunction with* plaintiffs' inability to depose Silver or FRBNY or obtain additional documents from them, prejudiced plaintiffs. We have concluded the referee did not abuse his discretion by denying plaintiffs' motion to compel additional discovery from FRBNY. We therefore consider only whether plaintiffs have shown that the allegedly erroneous failure to order production of *the Bank of America emails* was prejudicial.

Second, in its statement of decision, the court noted the absence of evidence as to the *creation* of the "PWR17 allonge" (which would have occurred before, and perhaps long before, Silver sent the January 8, 2010 email attaching the document), while the Bank of America emails sought by plaintiffs were sent on January 11, 2010 (after Silver sent her initial transmittal email and before Vaughn transmitted the "Maiden Lane allonge" back to Silver). While those emails may have pertained to Bank of America's "correct[ion]" or "alteration" of the allonge, it is less likely that they explained the earlier creation of the document.

37

Third, the court did not rely solely on the absence of evidence about the creation or authenticity of the PWR17 allonge in reaching its conclusion that Bear Stearns had not assigned the Note to the PWR17 securitization trust. To the contrary, as noted above, the court stated that, even if the document did exist in the Loan file, the court credited the evidence suggesting it was a clerical error, and concluded the Loan was never securitized. As we discuss further below, substantial evidence supports the court's conclusion that no assignment occurred. Plaintiffs have not shown it is reasonably probable that, if the referee had ordered production of the few Bank of America emails at issue, the outcome of the trial would have been different.

## C. The Trial Court's Resolution of Plaintiffs' Equitable Claims

Plaintiffs contend the trial court erred in determining they were not entitled to relief on their claims to set aside the foreclosure and for unfair competition. "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) " 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]' [Citation.] [¶] 'Questions of statutory interpretation, and the applicability of a statutory standard to undisputed facts, present questions of law, which we review de novo.' "[25] (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765.)

_____

[25] At oral argument, defendants' counsel contended (highlighting an argument featured in the introduction to their responding brief) that plaintiffs' opening brief does not fairly summarize the evidence in the record or the trial court's adverse findings and

38

### 1. The Cause of Action to Set Aside the Foreclosure Sale

"Case law instructs that the elements of an equitable cause of action to set aside a foreclosure sale are: (1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale (usually but not always the trustor or mortgagor) was prejudiced or harmed; and (3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 104 (*Lona*).) "A nonjudicial foreclosure sale is accompanied by a common law presumption that it 'was conducted regularly and fairly.' [Citations.] This presumption may only be rebutted by substantial evidence of prejudicial procedural irregularity. [Citation.] The 'mere inadequacy of price, absent some procedural irregularity that contributed to the inadequacy of price or otherwise injured the trustor, is insufficient to set aside a nonjudicial foreclosure sale. [Citations.]' [Citations.] It is the burden of the party challenging the trustee's sale to prove such irregularity and thereby overcome the presumption of the sale's regularity." (*Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1258.) As an alternative to showing prejudicial irregularities in the foreclosure sale process, a party may seek to set aside the sale on the ground it is void (rather than merely voidable), such as by showing the party that foreclosed did not have the power to do so. (See *Lona, supra,* 202 Cal.App.4th at p. 106.)

Here, plaintiffs contend (1) the foreclosure sale is void because CP III did not own the Note and thus had no power to foreclose, and (2) prejudicial irregularities in the foreclosure sale require that it be set aside. Substantial evidence supports the trial court's rejection of both arguments.

---

that, as a result, plaintiffs should be barred from challenging the sufficiency of the evidence to support the judgment. We need not address this argument because, as we discuss below, we decide this branch of the appeal on other grounds.

### a. Ownership of the Note

Plaintiffs contend that Bear Stearns assigned the Note to the PWR17 securitization trust, and that therefore the subsequent assignments of the Note to the Maiden Lane Trust and then to CP III were invalid. The trial court rejected this argument, finding that Bear Stearns never assigned the Note to PWR17, and that CP III owned the Note and had authority to foreclose.

A declaration from an officer of the trustee of PWR17 (which the court admitted into evidence at trial) supports the finding that Bear Stearns did not assign the Note to PWR17. At the time of trial, the trustee for the PWR17 trust (or "trust pool") was "U.S. Bank National Association, successor in interest to Bank of America, National Association (the 'Prior Trustee'), as successor by merger to LaSalle Bank National Association, as trustee for the registered holders of Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-PWR17." Kimberly Jacobs, an officer of the trustee, stated in a declaration (the Jacobs declaration) that, based on a review of the PWR17 trust pool's records (including its Pooling and Servicing Agreement, its Prospectus Supplement, and its Final Certification, which list the loans that were included in the trust pool), the Rincon Loan was not contained in the PWR17 trust pool. (These voluminous records were attached to the Jacobs declaration.) This evidence, which the court credited, supports the conclusion that no assignment from Bear Stearns to PWR17 occurred, that PWR17 did not own the Note, and that the "PWR17 allonge" was a clerical error.

Plaintiffs contend the Jacobs declaration was inadmissible hearsay.[26] The court admitted it as a declaration against interest under Evidence Code section 1230. Under that statute, an out-of-court statement is admissible over a hearsay objection "if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of

---

[26] At trial, plaintiffs objected on that ground to admission of the declaration (but not the attached PWR17 records, which they acknowledged had been properly authenticated).

civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) We review the court's ruling admitting the declaration for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153.)

Plaintiffs argue Jacobs was not unavailable. The court did not abuse its discretion in finding otherwise. Under the Evidence Code, a declarant is unavailable if he or she is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." (Evid. Code, § 240, subd. (a)(4).) In a civil case, a nonresident of California "is not obliged to attend as a witness before any court . . . ." (§ 1989; see *Nizinski v. State Bar* (1975) 14 Cal.3d 587, 590 [witness who resides beyond limits of subpoena power specified in § 1989 is unavailable within meaning of Evid. Code, § 240, subd. (a)(4)]; *Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London* (1995) 34 Cal.App.4th 554, 555, 559 [under § 1989, nonresident party cannot be compelled to attend trial].) The Jacobs declaration (which the court reviewed when considering its admissibility) states it was signed and notarized in Chicago, Illinois in June 2012. The court reasonably could conclude Jacobs was not a California resident when the court considered the declaration's admissibility during trial in July 2012, and plaintiffs made no contrary argument to the trial court.

Plaintiffs contend USB was a party and could or should have compelled Jacobs, its employee, to attend trial. The court noted, however, that plaintiffs sued USB solely in its capacity as trustee for the Maiden Lane Trust. The court correctly concluded, and plaintiffs do not dispute, that USB was not a party in its individual capacity or in its capacity as successor trustee for the PWR17 trust. Jacobs made her declaration on behalf of USB in its capacity as successor trustee for the PWR17 trust. The court did not abuse

41

its discretion in concluding that Jacobs was unavailable and that no party had procured her unavailability.[27]  (See Evid. Code, § 240, subds. (a)(4), (b).)

Plaintiffs next argue Jacobs's statements were not against her interest.  Again, we find no abuse of discretion.  Jacobs, speaking for USB in its capacity as the trustee of the PWR17 trust, stated that the PWR17 trust had no record of having an ownership interest in the Rincon Loan.  The trial court reasonably concluded Jacobs's statements were against the pecuniary interest of the PWR17 trust.  (See Evid. Code, § 1230.)

Plaintiffs contend Jacobs's statements were not against the self-interest of USB, because USB was also the trustee for the Maiden Lane Trust and it was in Jacobs's and USB's interest to favor the Maiden Lane Trust over the PWR17 trust.  The court did not abuse its discretion by rejecting this argument.  In light of USB's role as a fiduciary for the PWR17 trust, the court reasonably concluded that it was unlikely Jacobs would have made statements showing PWR17's lack of an ownership interest if they were not true.  (See Evid. Code, § 1230.)  Finally, the court reasonably concluded Jacobs's statements, which were based on her review of the relevant PWR17 records (and her knowledge of which records would list any loan that was part of the PWR17 trust), were reliable.

We are not persuaded by plaintiffs' remaining challenges to the court's finding that no assignment to PWR17 occurred.  Plaintiffs argue the court "misapprehended the significance" of testimony by Bear Stearns representatives that plaintiffs contend shows Bear Stearns intended to securitize the Rincon Loan.  But the trial court noted the Bear Stearns representatives did not recall the Rincon transaction and did not know whether the Rincon Loan was securitized.  Plaintiffs also state "*the allonge here* was delivered to the custodian [i.e., La Salle]" (italics added), but the portion of the record they cite in

---

[27] In their reply brief, plaintiffs assert for the first time that the court could not find Jacobs unavailable unless defendants showed they "diligently sought her attendance." We need not consider this belated argument. (See *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 720, fn. 10.)  It is incorrect in any event.  "[N]o showing of due diligence is required in civil cases when the witness is beyond the reach of the court's process." (*People v. Ware* (1978) 78 Cal.App.3d 822, 830, fn. 5; see Evid. Code, § 240, subd. (a)(4), (5).)

support of this statement just shows that, in connection with the origination of the loan in June 2007, Bear Stearns delivered to La Salle a *blank* allonge (executed by a Bear Stearns representative) allowing for a future assignment but designating no assignee. The court was not obligated to conclude the Loan was securitized.

Plaintiffs also assert that the existence of the PWR17 allonge was "sufficient" to prove an assignment to PWR17 (or "shifted the burden" on this issue to defendants). We are not persuaded that the trial court erred. Contrary to plaintiffs' repeated suggestion in their appellate briefs, the court did not simply rule against them based on an absence of evidence. Instead, as noted, the court explained that it "credit[ed] the evidence [(submitted by defendants)] that suggests that—if the attachment [i.e., the "allonge" attached to Silver's January 8, 2010 email] even existed in the Loan file—the PWR17 allonge was a clerical error, which the servicer corrected upon notice." As discussed, the Jacobs declaration explaining PWR17 had no record of owning the Loan supports the court's conclusion on this point. Moreover, an "Omnibus Assignment" executed by Bear Stearns in 2008 expressly assigned Bear Stearns's interest in the Loan to the Maiden Lane Trust, an action inconsistent with any belief by Bear Stearns that it previously had assigned the Note to PWR17. Although plaintiffs' counsel took the position at oral argument that the court's conclusion on this point was based on speculation, we see the court's determination that no assignment occurred as a fair inference from the objective evidence.

Finally, in a related argument, plaintiffs assert briefly that, even if the designation of PWR17 on the allonge was a clerical error, it was not one that Bank of America (as the master servicer for the Maiden Lane Trust) could correct. Again, this contention does not persuade us the trial court erred in finding CP III owned the Note. The evidence before the trial court supported a conclusion that (1) Bear Stearns had assigned its interest in the Loan to the Maiden Lane Trust in 2008, and (2) PWR17 never had any ownership interest in the Loan. It is difficult to see how either Bear Stearns or PWR17 could have been harmed by a correction (in 2010) of the erroneous designation of PWR17 on the allonge. We decline to hold that the clerical error was uncorrectable, or that the manner in which

43

it was corrected somehow establishes that the trial court committed reversible error in determining CP III owned the Note.[28]

### b. Alleged Irregularities in the Foreclosure Sale

As noted, to set aside the foreclosure sale based on irregularities in the sale process, plaintiffs had to show (1) the sale was illegal, fraudulent, or willfully oppressive; (2) plaintiffs were prejudiced; and (3) plaintiffs tendered the amount of the debt or were excused from tendering. (*Lona, supra,* 202 Cal.App.4th at p. 104.) The trial court found plaintiffs did not meet their burden to establish any of these elements. As to the first element, we conclude plaintiffs have not shown the court erred by rejecting their argument that the sale was "so flawed as to be willfully oppressive."[29]

In their post-trial briefs in the trial court, plaintiffs sought to establish this element by contending defendants "pursued a strategy to discourage other bidders" at the foreclosure sale, enabling CP III to obtain the Property for a low price. In support of this claim, plaintiffs argued principally that, although *they (plaintiffs)* recorded a lis pendens against the Property, it was CP III that discouraged bidders by waiting until the date of the foreclosure sale to file a motion to expunge the lis pendens. The court found the evidence did not support plaintiffs' assertion that defendants sought to suppress bidding. As to the lis pendens specifically, the court declined to draw from the above timeline an inference that *defendants* sought to suppress bidding, stating that, "[t]o the extent that title was clouded, I find that Plaintiffs chose to cloud it by [recording] the lis pendens." On appeal, plaintiffs insist the trial court "misconstrued" their argument on this point. We disagree. The court, after considering the evidence, just did not draw the inference

---

[28] Because we conclude substantial evidence supports the trial court's finding that no assignment to the PWR17 securitization trust occurred, we need not address defendants' argument that an assignment to a securitization trust "would not have affected the lender's ability to foreclose."

[29] We therefore need not address the parties' arguments as to whether plaintiffs established prejudice from the asserted flaws, or an excuse for their failure to tender the amount of the indebtedness.

advanced by plaintiffs. And the inference the court did draw (i.e., that plaintiffs, not defendants, clouded title) was reasonable.

In the trial court, plaintiffs also argued CP III did not respond to inquiries it received prior to the foreclosure sale from persons or entities who were interested in purchasing the Property. (The evidence plaintiffs have cited on this point consists of an email referring briefly to one such inquiry, and testimony suggesting there may have been others.) The court was not obligated to infer from this evidence that CP III, which did not yet own the Property, pursued a strategy of seeking to discourage other potential purchasers from appearing and bidding at the foreclosure sale. On appeal, plaintiffs fault the court for not expressly discussing these items of evidence, but the court was not obligated to do so. (See *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124–1125 [" '[A] trial court rendering a statement of decision . . . is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them.' "].)

Finally, plaintiffs argue on appeal that CP III sought to discourage bidding by changing the amount it claimed plaintiffs owed. The notice of default stated the amount due was approximately $110 million as of June 11, 2010, "and will increase until your obligations are paid in full." The notice of sale, which was recorded in late September 2010, stated the amount then due was approximately $118.5 million. In the trial court, plaintiffs argued that these documents were defective and that the notice of sale included amounts that should not have been charged. But plaintiffs did not contend in the trial court, as they now seek to do on appeal, that the alleged inaccuracies were included by CP III as part of a strategy to suppress bidding.[30] In reaching its conclusion that the

---

[30] Instead, after discussing the alleged strategy to suppress bidding (based on the evidence concerning the lis pendens and the inquiries about purchasing the Property), plaintiffs presented their objections to the notice of sale in separate sections of their post-trial briefs.

evidence did not show CP III sought to suppress bidding, the court did not err in failing to address an argument that plaintiffs never made.[31]

## 2. The Unfair Competition Law Claim

The unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) "defines unfair competition as 'any unlawful, unfair or fraudulent business act or practice.' ([Bus. & Prof. Code,] § 17200.) Therefore, under the statute 'there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent.' " (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311.) To have standing to sue for violation of the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322.)

The trial court concluded plaintiffs had not established that defendants' conduct was unlawful, unfair or fraudulent. The court also determined that plaintiffs had not shown causation, stating plaintiffs had not "linked any of the alleged conduct to the alleged harm."

In their opening appellate brief, plaintiffs argued the court erred in concluding defendants' *conduct* did not constitute unfair competition. In the section of their opening brief addressing the unfair competition claim, plaintiffs contended (1) the court applied an incorrect legal standard in determining whether defendants' conduct was unfair, (2) the court "misconstrued [defendants'] conduct," such as by "misinterpreting contract terms," "misreading documents," or "mischaracteriz[ing] evidence," and (3) the court's

---

[31] At oral argument in this court, plaintiffs' counsel suggested incorrect charges or other defects in the notice of sale could deter bidders, even if CP III did not include them for that purpose. But we are not persuaded that any such unintentional errors established that the sale was "illegal, fraudulent or willfully oppressive[.]" (*Lona, supra,* 202 Cal.App.4th at p. 104.) We also are not persuaded by counsel's suggestion that conduct plaintiffs discussed in their opening appellate brief in connection with the UCL cause of action provides a basis for reversing the court's resolution of the cause of action to set aside the foreclosure.

finding that plaintiffs were not entitled to extend the maturity date of the Loan (which the court concluded barred all of plaintiffs' claims) did not "insulate" defendants from liability for their allegedly unfair business practices. Plaintiffs did not, however, present any argument that the court erred in finding that they had not established causation. In their reply brief, plaintiffs present a short argument on this issue.

At oral argument, plaintiffs' counsel spun this attack on the trial court's UCL findings somewhat differently, claiming plaintiffs presented the following arguments in their opening brief in an effort to address causation: (1) the court mischaracterized evidence showing defendants approved a budget for the Property that required them to release funds for its operation, (2) the court misinterpreted the Loan Agreement and defendants' conduct in convincing Cohen to contribute funds for tax payments, (3) the court disregarded evidence showing defendants discouraged other bidders from participating at the foreclosure sale, and (4) the court's finding that plaintiffs were not entitled to extend the maturity date did not insulate defendants from liability for their unfair conduct, including allegedly engaging in "dual tracking" by seeking to sell the Loan while participating in loan modification discussions. All these points address alleged errors by the court in evaluating defendants' conduct; they do not present challenges to the court's finding of a lack of causation.

The trial court's judgment is presumed to be correct, and the appellant has the burden to overcome that presumption by demonstrating reversible error. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.) " ' "A point not presented in a party's opening brief is deemed to have been abandoned or waived." ' " (*Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 84, fn. 5; accord, *REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500.) By failing to present any arguments about causation in their opening brief, plaintiffs have forfeited any challenge to the trial court's finding on that issue.[32] Because causation is an

---

[32] Plaintiffs' counsel contended at oral argument that, because defendants briefly addressed causation at one point in their responding brief, they understood plaintiffs had addressed that issue. While this court may address a point not raised in an appellant's

47

essential prerequisite to maintaining suit under the UCL (see *Kwikset Corp. v. Superior Court, supra,* 51 Cal.4th at p. 322), the court's adverse finding on that issue is dispositive of plaintiffs' UCL claim. We therefore need not address plaintiffs' arguments as to whether the court erred in concluding defendants' conduct did not constitute unfair competition.

## III. DISPOSITION

The judgment is reversed as to plaintiffs' claims for breach of contract, fraud, slander of title, and violation of the UTSA (the First, Second, Third, Fourth, Seventh and Eighth Causes of Action in the Fifth Amended Complaint) and the case is remanded for further proceedings consistent with this opinion as to those causes of action. The judgment is affirmed as to plaintiffs' claims to set aside the foreclosure sale, for unfair competition, and for an accounting (the Fifth, Sixth and Ninth Causes of Action in the Fifth Amended Complaint). The parties shall bear their own costs on appeal.

_____
Streeter, J.

We concur:

_____
Reardon, Acting P.J.

_____
Rivera, J.

---

opening brief if the respondent anticipates and addresses the issue (see *Thompson v. Petaluma Police Department* (2014) 231 Cal.App.4th 101, 109), we are not persuaded that defendants' short legal argument about causation under the UCL—highlighting plaintiffs' silence on the point—shows they understood and had a chance to respond to all of the specific challenges by plaintiffs to the court's causation finding as reframed at oral argument.

Trial Court:    San Francisco Superior Court

Trial Judge:    Hon. Marla Miller

Counsel:

Boies, Schiller & Flexner, Jeremy M. Goldman, Christine Y. Wong, Nora K.C. Flum; Locke Lord, Kathleen Smalley; Boersch Shapiro and David Shapiro for Plaintiffs and Appellants.

Manatt, Phelps & Phillips, Barry W. Lee, Lenard G. Weiss, Christian E. Baker, Christopher A. Rheinheimer; and Jerome B. Falk, Jr. for Defendants and Respondents.

Hunton & Williams, Y. Anna Suh, Patrick L. Robson, and Joseph J. Saltarelli for nonparty Bank of America.